WILHELM v. BROOKLYN, Q. C. & S. R. CO.

(Supreme Court, Appellate Division, Second Department. July 23, 1898.)

1. APPEAL—QUESTION FOR JURY.

    Where, upon an appeal, a careful study of the testimony impresses the court with the very contradictory character of the evidence, so that it is not clear whether or not the jury came to the correct conclusion, it follows that the submission of the controversy to the jury was proper, and their verdict should not be disturbed.

2. DAMAGES—PERSONAL INJURIES.

    In an action to recover damages for personal injuries resulting from the alleged negligence of the defendant, it appeared that the plaintiff was 22 years old, and that when the accident happened he was thrown violently to the ground, and his head was cut; that he was confined for some time to his bed; and that his mind was seriously affected, so that he was for some months in the county hospital, and at the time of the trial it appeared that he was still in an impaired mental and physical condition. The jury gave him a verdict of $5,000. *Held,* that this was not excessive.

Appeal from trial term, Kings county.

Action by Peter Wilhelm against the Brooklyn, Queens County & Suburban Railroad Company. From a judgment on a verdict of $5,000 in favor of plaintiff and from an order denying a new trial, defendant appeals. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

John L. Wells, for appellant.

James D. Bell (A. H. Dailey, on brief), for respondent.

GOODRICH, P. J.    On October 15, 1895, the father of the plaintiff was owner of, and was driving, a furniture van out of Wallabout street, Brooklyn, across Broadway, intending to go into Moore street. The plaintiff, who was then 22 years of age, was riding on the tail-board of the van.    The defendant operated a trolley on Broadway. One of its cars collided with the rear wheel of the van, breaking the axle, and throwing the plaintiff violently to the ground, and giving him a severe shock.    His head was cut so that it bled.    He was picked up by his father, and was confined for some time to his bed, where it was found that blood was issuing from one of his ears. The attending physician recommended his removal to the hospital. There is evidence tending to show that for some months after the accident the plaintiff did no regular work, but sometimes went out with and assisted his father; that he acted queerly; that when he went to bed he could not remain there long,—wanted to go out some-where in the night,—and once, about midnight, ran into the street with only his shirt on; that he tried to jump into the flour bins used in a baker's shop; and that he appeared at times frightened without any reason, and would get into his mother's bed, apparently for pro-tection.    There was evidence that the plaintiff was, and also that he was not, very much addicted to the use of liquor.    He was sent to St. Catharine's Hospital on August 12, 1896, nearly a year after the accident.    As to the reason of his being sent there, the evidence is contradictory, some tending to show that it was on account of a condition resulting from his fall; some that he was suffering from alcoholism or from sunstroke; but there is evidence sufficient to justify a finding either way.    One of the doctors testified that the plaintiff spoke of seeing snakes and animals that were blue in color, and that bit him, and another testified that he had symptoms of "acute mania from alcoholism."    These are probably euphemistic words for characterizing "delirium tremens."    In a few days, on August 18th, it became apparent that he was suffering with mania, and he was transferred to the Kings County Hospital, where he re-mained till November 29th.    At the time of the trial he appeared to be in an impaired mental and physical condition, and, though present in court, he was not called as a witness.

The testimony required the submission to the jury of three ques-tions of fact, substantially as follows:    First. Was the father of the plaintiff, who was driving the van, guilty of negligence contributing to the collision?    Second. Was the defendant guilty of negligence causing the collision?    Third. Did the condition of the plaintiff re-sult from the injuries caused by the shock received at the time of the collision, or did it result from alcoholism or sunstroke, independently of the fall?

A careful study of the testimony impresses my own mind with the very contradictory character of the evidence.    Indeed, I am not clear

whether or not the jury came to the correct conclusion when they found all of these disputed questions of fact in favor of the plaintiff. With this effect created upon my own mind, it is not hard for me to believe that the jury had similar difficulty.     Such a condition of affairs rendered the submission of the controversy to the jury pre-eminently proper.     They have found for the plaintiff on all the questions, and their verdict is not to be disturbed.

The defendant contends that there were three admissions of expert medical testimony which constitute reversible error.     I think the evidence was properly admitted.

The only other question to be considered is the amount of the verdict.     If the plaintiff's condition resulted solely from the fall, the verdict is not excessive.     The court instructed the jury, upon this point, that the plaintiff "cannot recover damages for any illness or incapacity that is not the result of those injuries.     If you find that his present condition is due to insolation or alcoholism, either one or both of those, and not to these injuries, he cannot recover any damages."     The judgment and order must be affirmed.     All concur.